UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| FRANK R. O'BRIEN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 4:12-CV-476 (CEJ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| HEALTH AND HUMAN SERVICES, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on defendants' motion to dismiss plaintiffs' amended complaint pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure.  Plaintiffs oppose the motion, and the issues are fully briefed.[1]

Plaintiffs bring this action for declaratory and injunctive relief, claiming that regulations promulgated under the Patient Protection and Affordable Care Act (ACA) Pub. L. No. 111-148, 124 Stat. 119 (2010), violate plaintiffs' statutory and constitutional rights.  Specifically, plaintiffs allege violations of the First Amendment, the Religious Freedom Restoration Act (RFRA), and the Administrative Procedure Act (APA).[2]  Defendants move to dismiss the entire amended complaint for failure to state a claim upon which relief can be granted and to dismiss the Administrative Procedure Act claim for lack of subject matter jurisdiction.

### I.    Background

---

[1]The American Civil Liberties Union has submitted an amicus curiae brief in support of defendants' motion to dismiss.

[2] This suit is one of over 30 cases filed challenging the constitutionality of the ACA regulations.  See The Becket Fund for Religious Liberty - HHS Mandate Information Central, http://www.becketfund.org/hhsinformationcentral/ (last visited September 24, 2012).

The plaintiffs in this case are Frank O'Brien and O'Brien Industrial Holdings, LLC (OIH), the limited liability company in which he holds the sole voting interest and of which he is the chairman and managing member.  OIH is a secular, for-profit company in St. Louis, Missouri, that is engaged in the business of mining, processing, and distributing refractory and ceramic materials and products.  Frank O'Brien is Catholic and tries to manage and operate OIH in a manner consistent with his religion.[3]

Defendants are the U.S. Department of Health and Human Services (HHS), Kathleen Sebelius in her official capacity as Secretary of HHS, the U.S. Department of Treasury, Timothy F. Geithner in his official capacity as Secretary of the Treasury, the U.S. Department of Labor (DOL), and Hilda L. Solis in her official capacity as Secretary of the DOL.  Collectively, defendants are the departments and officials responsible for adopting, administering, and enforcing the regulations to which plaintiffs object.

The ACA contains a preventive services coverage provision which provides:

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for… (4) with respect to women, such additional preventive care and screenings… as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

42 U.S.C. § 300gg-13 (a).[4]  The Health Resources and Services Administration

---

[3] In OIH's main lobby is a statue of the Sacred Heart of Jesus.  OIH's mission, as it appears on the company website, is "to make our labor a pleasing offering to the Lord…."  OIH's statement of values includes references to the Golden Rule and the Ten Commandments, and OIH's "Explanation of Mission & Values" includes a direct quotation from the New Testament.  Finally, OIH and its subsidiaries "pledge to tithe on the earnings of the Companies."  Am. Compl. ¶¶ 20-23, [Doc. #19].

[4] This provision was added as the "Women's Health Amendment" to the ACA during the legislative process.

(HRSA), an agency within HHS, commissioned the Institute of Medicine (IOM) to conduct a study on preventive services necessary to women's health.  The IOM, in a report entitled "Clinical Preventive Services for Women: Closing the Gaps," issued recommendations that HRSA adopted on August 1, 2011.  The HRSA guidelines include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  Women's Preventive Services: Required Health Plan Coverage Guidelines, HEALTH RESOURCES AND SERVICES ADMINISTRATION, http://www.hrsa.gov/womensguidelines/ (last visited Sep. 18, 2012).  Among the FDA-approved contraceptive methods are diaphragms, oral contraceptive pills, emergency contraceptives, and intrauterine devices.   Birth Control Guide, FDA OFFICE OF WOMEN'S HEALTH, www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/ FreePublications/UCM282014.pdf (last updated Aug. 2012).

HHS, the Department of Labor, and the Department of Treasury published rules finalizing the HRSA guidelines on February 15, 2012.  77 Fed. Reg. 8725, 8726.[5]  Employers must provide group health plans with coverage conforming with the guidelines for plan years beginning on August 1, 2012.  75 Fed. Reg. 41726, 41729.

Several exemptions and safe-harbor provisions excuse certain employers from providing group health plans that cover women's preventive services as defined by HHS regulations.  First, religious employers are exempt from providing plans covering contraceptive services.  Religious employers are defined as employers meeting all of the following criteria:

---

[5] This regulation is referred to by plaintiffs as "the Mandate" or "the Final Rule."  Am. Compl. ¶ 2, [Doc. #19], and by defendants as "the preventive services coverage regulations."

(1) The inculcation of religious values is the purpose of the organization; (2) The organization primarily employs persons who share the religious tenets of the organization; (3) The organization serves primarily persons who share the religious tenets of the organization; (4) The organization is a nonprofit organization as described in [provisions of the Internal Revenue Code referring to churches, associations of churches, and exclusively religious activities of religious orders].

45 C.F.R. §147.130(a)(1)(iv)(B); 76 Fed. Reg. 46621-01, 46623 (Aug. 3, 2011). Second, "grandfathered" health plans (plans in which individuals were enrolled on March 23, 2010, the date the ACA was enacted) are not subject to the preventive services provision of the ACA. 75 Fed. Reg. 34538-01 (June 17, 2010). Third, a temporary enforcement safe-harbor provision applies to certain non-profit organizations not qualifying for any other exemption. The safe-harbor provision ensures that no department will take enforcement action against non-profit employers and their group health plans that "on or after February 10, 2012 do not provide some or all of the contraceptive coverage otherwise required, consistent with any applicable State law, because of the religious beliefs of the organization." 77 Fed. Reg. 16501, 16502 (March 21, 2012); 77 Fed. Reg. 8725 (Feb. 15, 2012). The safe-harbor "is in effect until the first plan year that begins on or after August 1, 2013." 77 Fed. Reg. 16501, 16503 (March 21, 2012).[6] Finally, employers with fewer than 50 employees need not provide employees with any health insurance plan. 26 U.S.C. §4980(H)(c)(2)(A) (defining a large employer subject to fines for failing to provide a plan to employees as "an employer who employed an average of at least 50 full-time employees on business days during the preceding calendar year.")

---

[6] The departments have issued an advanced notice of proposed rulemaking (ANPRM), stating that during the safe-harbor, the departments will consider amending the definition of "religious employer." 77 Fed. Reg. 16501, 16504 (March 21, 2012).

Plaintiffs do not qualify for any of these exemptions.[7]  As a secular, for-profit employer, OIH does not satisfy the definition of "religious employer," and is ineligible for the protection of the temporary enforcement safe-harbor.  The grandfathered plans provision also does not assist OIH, because the current group health insurance policy OIH provides to its employees covers contraceptives.  "When OIH switched from a self-insured plan to a fully-insured plan several years ago, coverage of contraceptive services was inadvertently included contrary to the company's longstanding practice and intentions, as well as the actual coverage request and without OIH's knowledge."  Am. Compl. ¶ 28 [Doc. #19].  Finally, OIH employs 87 individuals; therefore, if plaintiffs do not provide employees with any group health insurance plan, plaintiffs will be subject to fines.  Likewise, fines may be imposed if plaintiffs provide a group plan, but the plan excludes coverage for contraceptives and other women's preventive care.[8]

The OIH health plan is due for renewal on January 1, 2013.  Plaintiffs state they face a choice between "complying with [the ACA's] requirements in violation of their religious beliefs, or paying ruinous fines that would have a crippling impact on their ability to survive economically."  Am. Compl. ¶36 [Doc. #19].  The regulations creating this choice, plaintiffs argue, violate their rights under RFRA and the First Amendment to the United States Constitution and run afoul of the APA.  Before the Court is defendants' motion to dismiss plaintiffs' claims pursuant to the Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).  Plaintiffs have also moved for a preliminary

---

[7] This distinguishes the current case from other similar cases against HHS that have been dismissed for lack of Article III standing or ripeness.  See, e.g., Wheaton College v. Sebelius, Civ. A. 12-1169 ESH, 2012 WL 3637162 (D.D.C. August 24, 2012);  State of Nebraska v. HHS, 4:12cv3035,  2012 WL 2913402 (D. Neb. July 17, 2012).

[8] Employers failing to meet the group health plan requirements will face a $100/per day tax for every employee.  26 U.S.C. §4980(D).  Employers failing to provide any group health plan face annual fines of $2000 for every employee.  Id. at (H)

injunction, to prevent defendants from enforcing the challenged regulations against plaintiffs as they select a new employee health plan before January 1, 2013. [Doc. #38].

## II. Legal Standard

The purpose of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is to test the legal sufficiency of the complaint. The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) citing Swierkiewicz v. Sorema N.A., 534 U.S.506, 508 n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim. Id. A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp., 127 S. Ct. at 1974; See also id. at 1969 ("no set of facts" language in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), "has earned its retirement."). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965.

Dismissal under Rule 12(b)(1) of the Federal Rules of Civil Procedure is appropriate if the plaintiff has failed to satisfy a threshold jurisdictional requirement. See Trimble v. Asarco, Inc., 232 F.3d 946, 955 n.9 (8th Cir. 2000). A dismissal for

-6-

lack of subject matter jurisdiction requires that the complaint be successfully challenged on its face or on the factual truthfulness of its averments. Titus v. Sullivan,4 F.3d 590, 593 (8th Cir. 1993). In a facial attack, the court restricts itself to the face of the pleadings, and all of the factual allegations concerning jurisdiction are presumed to be true. Id. However, in a factual challenge, the court considers matters outside of the pleadings, and no presumptive truthfulness attaches to the plaintiff's allegations. Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Furthermore, the existence of disputed material facts does not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Id. at 729. "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction – its very power to hear the case – there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Id. The burden of proving that jurisdiction exists rests with the plaintiff. Id.

### III. Discussion

#### A. The Religious Freedom Restoration Act

The Religious Freedom Restoration Act (RFRA) forbids government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §2000bb-1(a), (b). RFRA was enacted by Congress in response to Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872, 879 (1990) (holding that, under the First Amendment, "the right of free exercise does not relieve an individual of the obligation to comply with a valid

-7-

and neutral law of general applicability") (internal quotations omitted).  Congress intended RFRA "to restore the compelling interest test as set forth in <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963) and <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened."  42 U.S.C. §2000bb(b)(1).

In order to state a prima facie case under RFRA, plaintiffs must allege a substantial burden on their religious exercise.  RFRA defines the "exercise of religion" broadly as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. §2000bb-2(4); 42 U.S.C. §2000cc-5.  In the instant case, the Court does not doubt the sincerity of plaintiffs' beliefs, nor does the Court question the centrality of plaintiffs' condemnation of contraception to their exercise of the Catholic religion.  Indeed, as plaintiffs note, "[j]udging the centrality of different religious practices is akin to the unacceptable business of evaluating the relative merits of differing religious claims." <u>Employment Div. v. Smith</u>, 494 U.S. at 886 (quoting <u>United States v. Lee</u>, 455 U.S. 252, 263 (1982) (internal quotations omitted)).

Defendants assert that OIH, as a secular limited liability company, by definition cannot "exercise" a religion, and therefore cannot assert claims under RFRA or the First Amendment Free Exercise Clause.  A district court in Colorado, currently considering another case in which a secular, for-profit corporation and its managers bring First Amendment and RFRA challenges to the coverage regulations, accurately noted that, "[t]hese arguments pose difficult questions of first impression.  Can a corporation exercise religion?" <u>Newland v. Sebelius</u>, 1:12-cv-1123, 2012 WL 3069154, at *6 (D.

-8-

Co. July 27, 2012) (granting plaintiffs' motion for preliminary injunction, and enjoining the enforcement of the preventive services coverage regulations against plaintiffs).

Plaintiffs in this case argue that the Court should presume corporations are included within the word "person" in RFRA, and that it would be unreasonable to conclude that secular corporations cannot exercise religion after the Supreme Court's application of the First Amendment Free Speech Clause to corporations in Citizens United v. Fed. Election Com'n, 558 U.S. 310 (2010). According to plaintiffs, there is no principled reason to apply one clause of the First Amendment to corporations but not another. Because this Court finds that the preventive services coverage regulations do not impose a "substantial burden" on either Frank O'Brien or OIH, and do not violate either plaintiffs' rights under the Free Exercise Clause, this Court declines to reach the question of whether a secular limited liability company is capable of exercising a religion within the meaning of RFRA or the First Amendment.

Assuming, arguendo, that OIH can exercise a religion within the meaning of RFRA, the burden on that exercise is too attenuated to state a claim for relief. The term "substantial burden" is not defined by RFRA or the Religious Land Use and Institutionalized Persons Act (RLUIPA), which adopted RFRA's same "substantial burden" test. 42 U.S.C. §§ 2000cc et seq. However, the plain meaning of "substantial" suggests that the burden on religious exercise must be more than insignificant or remote, and case law confirms this common-sense conclusion. E.g., Midrash Shephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004) ("a substantial burden must place more than an inconvenience on religious exercise; a substantial burden is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.")

-9-

Courts frequently look to free exercise cases predating <u>Employment Div. v. Smith</u> to determine which burdens cross the threshold of substantiality. <u>See</u>, <u>e.g.</u>, <u>Goodall by Goodall v. Stafford Cnty. School Bd.</u>, 60 F.3d 168, 171 (4th Cir. 1995) ("since RFRA does not purport to create a new substantial burden test, we may look to pre-RFRA cases in order to assess the burden on the plaintiffs for their RFRA claim.") <u>See also</u> <u>Living Water Church of God v. Charter Twp. of Meridian</u>, 258 F. App'x 729, 736 (6th Cir. 2007) ("Congress has cautioned that we are to interpret 'substantial burden' in line with the Supreme Court's 'Free Exercise' jurisprudence, which suggests that a 'substantial burden' is a difficult threshold to cross.")   Laws substantially burdening the exercise of religion often discourage free exercise by exacting a price for religious practice:  plaintiff must forfeit a benefit, pay a fine, or even face criminal prosecution.

Especially relevant are <u>Sherbert v. Verner</u> and <u>Yoder v. Wisconsin</u>, the cases presenting the test that RFRA was intended to restore.  In <u>Sherbert v. Verner</u>, plaintiff's religious exercise was impermissibly burdened when plaintiff was forced to "choose between following the precepts of her religion [by resting, and not working, on her Sabbath] and forfeiting [unemployment] benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." 374 U.S. at 404.  Similarly, in <u>Wisconsin v. Yoder</u>, members of the Amish religion were forced to select between educating their children as their religion demanded and facing criminal prosecution, or sending their children to school in contravention of their religious beliefs.  406 U.S. at 218.  ("The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under

-10-

threat of criminal sanction to perform acts undeniably at odds with the fundamental tenets of their religious beliefs.") More recently, in Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 426 (2006), the government conceded that the Controlled Substances Act imposed a substantial burden on the religious exercise when the Act prevented a religious sect from engaging in their traditional communion using a hallucinogenic tea.

Plaintiffs allege that the preventive services coverage regulations impose a similar ultimatum, and therefore substantially burden their free exercise of religion "by coercing Plaintiffs to choose between conducting their business in accordance with their religious beliefs or paying substantial penalties to the government." Am. Compl. ¶ 40 [Doc. #19]. However, the challenged regulations do not demand that plaintiffs alter their behavior in a manner that will directly and inevitably prevent plaintiffs from acting in accordance with their religious beliefs. Frank O'Brien is not prevented from keeping the Sabbath, from providing a religious upbringing for his children, or from participating in a religious ritual such as communion. Instead, plaintiffs remain free to exercise their religion, by not using contraceptives and by discouraging employees from using contraceptives. The burden of which plaintiffs complain is that funds, which plaintiffs will contribute to a group health plan, might, after a series of independent decisions by health care providers and patients covered by OIH's plan, subsidize *someone else's* participation in an activity that is condemned by plaintiffs' religion. This Court rejects the proposition that requiring indirect financial support of a practice, from which plaintiff himself abstains according to his religious principles, constitutes a substantial burden on plaintiff's religious exercise.

-11-

RFRA is a shield, not a sword. It protects individuals from substantial burdens on religious exercise that occur when the government coerces action one's religion forbids, or forbids action one's religion requires; it is not a means to force one's religious practices upon others. RFRA does not protect against the slight burden on religious exercise that arises when one's money circuitously flows to support the conduct of other free-exercise-wielding individuals who hold religious beliefs that differ from one's own.

Indeed, if the financial support of which plaintiffs complain was in fact substantially burdensome, secular companies owned by individuals objecting on religious grounds to all modern medical care could no longer be required to provide health care to employees. A district court has already rejected a RFRA challenge to the individual mandate of the ACA as applied to plaintiffs whose religion forbids seeking medical care. "[T]he conflict between the [ACA's] requirements and Plaintiffs' Christian faith does not rise to the level of a substantial burden… Plaintiffs have failed to allege any facts demonstrating that this conflict is more than a de minimis burden on their Christian faith…. Finally… Plaintiffs routinely contribute to other forms of insurance, such as Medicare, Social Security, and unemployment taxes, which present the same conflict with their belief that God will provide for their medical and financial needs." Mead v. Holder, 766 F.Supp.2d 16, 42 (D.D.C. 2011).

Just as in Mead, plaintiffs must contribute to a health care plan which does not align with their religious beliefs. In this case, however, the burden on plaintiffs is even more remote; the health care plan will offend plaintiffs' religious beliefs only if an OIH employee (or covered family member) makes an independent decision to use the plan to cover counseling related to or the purchase of contraceptives. Already, OIH and

-12-

Frank O'Brien pay salaries to their employees---money the employees may use to purchase contraceptives or to contribute to a religious organization. By comparison, the contribution to a health care plan has no more than a *de minimus* impact on the plaintiff's religious beliefs than paying salaries and other benefits to employees.

Under plaintiffs' interpretation of RFRA, a law substantially burdens one's religion whenever it requires an outlay of funds that might eventually be used by a third party in a manner inconsistent with one's religious values. This is at most a de minimus burden on religious practice. The challenged regulations are several degrees removed from imposing a substantial burden on OIH, and one further degree removed from imposing a substantial burden on OIH's owner and manager, Frank O'Brien. Because there is no substantial burden imposed on either plaintiff's religious exercise, plaintiffs have failed to state a claim under RFRA. Count I of the Amended Complaint will be dismissed.

### B.    The Free Exercise Clause of the First Amendment

The Free Exercise clause of the First Amendment states, "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof." Under the Free Exercise Clause, an individual's freedom of religious belief is absolute, but freedom of conduct is not. E.g., Bowen v. Roy, 476 U.S. 693, 699 (1986). A neutral law of general applicability that incidentally burdens religious exercise need only satisfy rational basis review, not strict scrutiny. Employment Div. v. Smith, 494 U.S. 872 (1990). Because the challenged regulations are both neutral and generally applicable, the Court again will not address the question of whether OIH, a secular limited liability company, can claim free exercise rights under the First Amendment.

-13-

"Neutrality and general applicability are interrelated…"  Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 532 (1993), and a deficiency in one prong suggests a deficiency in the other.  A law is not neutral "if the object of the law is to infringe upon or restrict practices because of their religious motivation." Id. at 533.  An impermissible object may be discerned through the law's text, legislative history, and the actual effect of the law in operation.  Id. at 533, 535, 540.  A law is not generally applicable if it "in a selective manner impose[s] burdens only on conduct motivated by religious belief."  Id. at 543.

In this case, the Court finds that the preventive services coverage regulations are neutral.      The regulations were passed, not with the object of interfering with religious practices, but instead to improve women's access to health care and lessen the disparity between men's and women's healthcare costs.  This is evident from both the inclusion of the religious employer exemption, as well as the legislative history of the ACA's Women's Health Amendment.  See, e.g., 2009 WL 4405642; 155 Cong. Rec. S12265, S12271 (daily ed. Dec. 3, 2009) (statement of Sen. Franken) ("The problem [with the current bill] is, several crucial women's health services are omitted.  [The Women's Health Amendment] closes this gap.")  See also 2009 WL 4280093; 155 Cong. Rec. S12021-02, S12027 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand) ("… in general women of childbearing age spend 68 percent more in out-of-pocket health care costs than men… This fundamental inequity in the current system is dangerous and discriminatory and we must act.")

Plaintiffs argue that, because many employers already provide coverage for women's preventive services, the law must have been purposefully targeted at religious objectors.  However, a neutral and perfectly constitutional law may have a

-14-

disproportionate impact upon religiously inspired behavior.    For example, a law requiring pharmacists to fill contraceptive prescriptions may be neutral although it primarily impacts pharmacists refusing to provide the contraceptives for religious reasons. Stormans, Inc. v. Selecky, 586 F.3d 1109, 1131 (9th Cir. 2009).   "The Free Exercise Clause is not violated even though a group motivated by religious reasons may be more likely to engage in the proscribed conduct." Id. See also American Life League, Inc. v. Reno, 47 F.3d 642, 654 (4th Cir. 1995) (upholding the Freedom of Access to Clinic Entrances Act against a Free Exercise Clause challenge, despite a disparate impact on religious opponents of abortion; the Act "punishes conduct for the harm it causes, not because the conduct is religiously motivated.  By necessity, then, the Act does not punish religious belief.")

    Also, contrary to plaintiffs' assertion, the religious employer exemption does not compromise the neutrality of the regulations by favoring certain religious employers over others.  Rather, as explained above, the religious employer exemption presents a strong argument in favor of neutrality, demonstrating that the "object of the law" was not "to infringe upon or restrict practices because of their religious motivation." Lukumi, 508 U.S. at 533.   In Catholic Charities of Diocese of Albany v. Serio, 7 N.Y. 3d 510 (2006), *cert. denied*, 552 U.S. 816 (2007), which involved a Free Exercise Clause challenge to a state law requiring employers to provide health care covering contraceptives, the New York Court of Appeals wrote:

> The neutral purpose of the challenged portions of the [health care law] - to make contraceptive coverage broadly available to New York women - is not altered because the Legislature chose to exempt some religious institutions and not others.  To hold that any religious exemption that is not all-inclusive renders a statute non-neutral would be to discourage the enactment of any such exemptions - and thus to restrict, rather than promote, freedom of religion.

-15-

Id. 7 N.Y. 3d at 522.

Additionally, the regulations are generally applicable, as they do not "in a selective manner impose burdens only on conduct motivated by religious belief." Lukumi, 508 U.S. at 543. The exemptions, for grandfathered plans, religious employers, and non-profits under the safe-harbor do not undermine the general applicability of the regulations within the meaning of Free Exercise Clause jurisprudence. "General applicability does not mean absolute universality." Olsen v. Mukasey, 541 F.3d 827, 832 (8th Cir. 2008). In Olsen, the Eighth Circuit held that the Controlled Substances Act was generally applicable despite exemptions for alcohol, tobacco, certain medical uses of marijuana, and sacramental use of peyote. Id. Instead, exemptions undermining "general applicability" are those tending to suggest disfavor of religion. For example, the ordinance regulating animal slaughter in Lukumi was not generally applicable because it applied only to animal sacrifice and not to hunting, or other secular practices in which the alleged concerns of animal cruelty and public health applied in equal force. 508 U.S. at 542-46. "The ordinances ha[ve] every appearance of a prohibition that society is prepared to impose upon [Santeria worshipers] but not upon itself. This precise evil is what the requirement of general applicability is designed to prevent." Id. at 545-46. The regulations in this case apply to all employers not falling under an exemption, regardless of those employers' personal religious inclinations.[9]

---

[9] Furthermore, the system of exemptions which exists under the ACA is categorical, and not individualized, so plaintiffs cannot claim a Free Exercise Clause violation under the unemployment insurance benefits cases. Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707 (1981); Hobbie v. Unemployment Appeals Comm'n of Florida, 480 U.S. 136 (1987); Sherbert v. Verner, 374 U.S. 398 (1963).

For the reasons discussed above, the Court concludes that the regulations at issue in this case are neutral and generally applicable, and do not offend the First Amendment's Free Exercise Clause.  Therefore, Count II of the Amended Complaint will be dismissed for failure to state a claim.

### C.     The Establishment Clause of the First Amendment

The "clearest command of the Establishment Clause" is that the government must not treat any religious denomination with preference over others.  Larson v. Valente, 456 U.S. 228, 244 (1982).  See also Gillette v. United States, 401 U.S. 437, 449 (1971) ("… perhaps the central purpose of the Establishment Clause [is] the purpose of ensuring governmental neutrality in matters of religion.")    The Establishment Clause also guards against "excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 613 (1971) (quoting Walz v. Tax Comm'n of City of New York, 397 U.S. 664, 674 (1970)).  Plaintiffs claim that the preventive services coverage regulations, in conjunction with the religious employer exemption, create both an impermissible government preference in favor of organized religion over less formal manifestations of religious practice and excessive entanglement as the government evaluates religious beliefs to determine whether an organization qualifies for the exemption.

### 1. Government Neutrality

The religious employer exemption does not differentiate between religions, but applies equally to all denominations.  If the employer's purpose is to inculcate religious values, the employer primarily employs and serves persons sharing those values, and is a nonprofit religious organization as defined in certain provisions of the Internal

Revenue Code, then that employer is eligible for the exemption, regardless of denomination. 45 C.F.R. §147.130(a)(1)(iv)(B).

Yet, plaintiffs claim that the government has departed from the neutrality the Establishment Clause requires. First, plaintiffs believe the religious employer exemption embodies the government's "theological position" that "religious organizations that emphasize religious education of members of their own faith are more *truly* religious, and deserving of an exemption, than faith-based organizations that pursue any other religious mission." Pls.' Memo. Opp. Defs.' Mot. Dismiss, at 32 [Doc. #31]. Second, plaintiffs suggest that, because the exemption applies to organizations primarily employing persons sharing the same faith, certain denominations, such as Old Order Amish and Orthodox Jewish groups, will benefit from the exemption more than others. Id. at 31-32, n. 19 [Doc. #31].

Plaintiffs' first argument fails, because while the Establishment Clause prohibits denominational preferences, it does not prohibit the government from distinguishing between religious organizations based upon structure and purpose when granting religious accommodations. See Walz, 397 US 664 (1970) (rejecting an Establishment Clause challenge to New York's property tax exemption for property of religious organizations used solely for religious worship). See also Droz v. Comm'r of IRS, 48 F.3d 1120, 1124 (9th Cir. 1995) (upholding a Social Security tax exemption for only members of organized religious sects, because the exemption's purpose was not to discriminate among religious *denominations*.) Plaintiffs' reliance on Larson v. Valente, 456 U.S. 228 (1982), is misplaced. In Larson, the Supreme Court struck down a statute that exempted from income-reporting requirements only those religious organizations that received more than half of their total contributions from members.

-18-

Although neutral on its face, the Court found that the law effectively distinguished between "well-established churches" and "churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance of financial support from members." 456 U.S. at 247, n.23 [*quoting* Valente v. Larson, 637 F.2d 562, 566 (8th Cir. 1981)].  This was constitutionally problematic, not because the law discriminated between religious organizations based upon their structure, but because the law had both the purpose and the effect of discriminating against certain denominations.  "This statute does not operate evenhandedly, nor [as its legislative history reveals] was it designed to do so: The fifty percent rule… effects the selective legislative imposition of burdens and advantages upon particular denominations."  Id. at 253-54.  The exemption in this case, unlike the exemption in Larson, was not designed as a "religious gerrymander," but as a permissible religious accommodation.

The religious employer exemption in the ACA is one of a number of instances of government accommodation of religion.[10]   As the Supreme Court has frequently articulated, there is space between the religion clauses, in which there is "room for play in the joints;" government may encourage the free exercise of religion by granting religious accommodations, even if not required by the Free Exercise Clause, without running afoul of the Establishment Clause.  See, e.g., Walz, 397 U.S. at 669; Locke v. Davey, 540 U.S. 712, 718-19 (2004); Cutter v. Wilkinson, 544 U.S. 709, 713-14 (2005).  Accommodations of religion are possible because the legislative line-drawing to which the plaintiffs object, between the religious and the secular, is constitutionally

---

[10] Just last term, the Supreme Court recognized the existence of the "ministerial exception," barring "ministers'" Title VII suits against their religious employers. Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C., 132 S.Ct. 694 (2012).

permissible.  The religious employer exemption, by necessity, distinguishes between religious and secular employers, and HHS has selected a logical bright line between the two.  Surely many secular employers, like OIH, follow the "Golden Rule," contribute to charities, or consider their secular labors to be pleasing to a higher power.  If the Constitution required Congress to provide exemptions for such employers whenever an exemption was also allowed for churches organized specifically for the purpose of promoting a religion, the accommodation would swallow the rule.

The highest state courts of New York and California have addressed arguments similar to the plaintiffs' when rejecting Establishment Clause challenges to their respective state health care laws, and the reasoning of those courts is instructive:

> Plaintiffs' theory would call into question any limitations placed by the Legislature on the scope of any religious exemption - and thus would discourage the Legislature from creating any such exemptions at all. But... legislative accommodation to religious believers is a long-standing practice completely consistent with First Amendment principles.   A legislative decision not to extend an accommodation to all kinds of religious organizations does not violate the Establishment Clause.

Catholic Charities of Diocese of Albany v. Serio, 7 N.Y. 3d at 529 (2006).  Similarly, the California Supreme Court explained, "Such legislative accommodations would be impossible as a practical matter if the government were, as the Catholic Charities argues, forbidden to distinguish between the religious entities and activities that are entitled to accommodation and the secular entities and activities that are not." Catholic Charities of Sacramento, Inc. v. Superior Court, 32 Cal.4th 527 (2004), *cert. denied*, 543 U.S. 816 (2004).  This Court agrees, and therefore rejects plaintiffs' primary argument, that the government adopts a "theological position" when granting an exemption to religious employers but not to secular employers maintaining religious values like OIH.

Plaintiff also suggests that certain denominations, such as Old Order Amish and Orthodox Jewish groups, may incidentally benefit from the exemption more frequently than other denominations. Even if this were true, it does not alter the fact that the exemption does not purposefully discriminate between religious sects. In Gillette, the Supreme Court rejected the argument that a conscientious objector statute, allowing for religious objections to war in general but not to particular wars, violated the Establishment Clause because it disproportionately excluded objectors from certain sects that did not condemn all war, but distinguished between just and unjust wars. 401 U.S. at 452-54. That religious exemption, like this one, had "nothing to do with a design to foster or favor any sect, religion, or cluster of religions." Id. at 452.

### 2. Excessive Entanglement

When analyzing a law for entanglement, "the questions are whether the [government] involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." In this case, there can be no entanglement as applied to these particular plaintiffs, since neither satisfies the non-profit criteria required for religious employer status. Thus, the government would not reach an assessment of whether O'Brien and OIH's purpose is to inculcate religious values, and whether they primarily employ and serve persons sharing those values. Still, such an assessment would not rise to the level of impermissible entanglement, and is relatively unintrusive compared to many government inquiries into religious practices upheld by the Supreme Court. See, e.g., Bowen v. Kendrick, 487 US 589 (finding no excessive entanglement when government monitored religious organizations' use of federal grants); Roemer v. Bd. of Pub. Works of Maryland, 426 US 736 (holding no excessive entanglement resulted

from state's annual audit of teaching materials in religious colleges, to ensure state grants were not used for "sectarian purposes"); <u>Agostini v. Felton</u>, 521 US 203 (1997) (concluding that unannounced monthly visits to religious schools to monitor content taught by public employees in those schools did not amount to excessive entanglement). In these cases, distinguishing the secular from the religious was not excessively entangling, nor is distinguishing secular employers from religious employers under the ACA's religious employer exemption.

The plaintiffs have failed to state a claim under the Establishment Clause, because the religious employer exemption is a neutral religious accommodation for all denominations, and does not excessively entangle government and religion. Thus, Count III of the Amended Complaint will be dismissed.

### D. <u>The Free Speech Clause of the First Amendment</u>

The Supreme Court has long recognized that the First Amendment protects both the freedom to speak and the freedom from compelled speech. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." <u>West Virginia State Bd. of Educ. v. Barnette</u>, 319 U.S. 624, 642 (1943) (holding a statute requiring recitation of the pledge of allegiance unconstitutional). Free speech also encompasses the right to donate funds to support the speech of others, <u>Buckley v. Valeo</u>, 424 U.S. 1 (1976), or to refuse financial support to causes with which one disagrees. <u>United States v. United Foods, Inc.</u>, 533 U.S. 405 (2001) (holding unconstitutional a statute requiring mushroom producers to contribute towards advertisements promoting mushroom sales).

It is clear that the preventive services coverage regulations do not require plaintiffs to speak, in a literal sense.  Plaintiffs remain free to express their views and to discourage their employees from using contraception.  However, plaintiffs argue that the regulations require plaintiffs to subsidize other private individuals' speech and to subsidize "conduct [that] is inherently expressive."  Pls.' Memo. at 36 [Doc. #31].  Plaintiffs encourage the Court to apply the strict scrutiny review that the Supreme Court has used "in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity."  United Foods, 533 U.S. at 412; Abood v. Detroit Bd. of Educ., 431 U.S. 209, 234 (1977) (declaring agency shop agreements unconstitutional when they require workers to subsidize unions' spending "to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative"); Keller v. State Bar of California, 496 U.S. 1, 5 (1990) (finding mandatory bar association dues unconstitutional when, using those dues, the bar association "lobbied the Legislature and other government agencies, filed amicus curiae briefs in pending cases, held an annual conference of delegates at which issues of current interest are debated and resolutions approved, and engaged in a variety of education programs.")

There is an important distinction between the instant case and the Supreme Court's compelled speech subsidy cases: *plaintiffs in this case are not subsidizing speech.*  The plaintiffs' contribution to their employees' receipt of health care benefits (as required by the regulations) is conduct, not speech.  It is true that the receipt of health care benefits often includes a conversation between a doctor and a patient, and the preventive services coverage regulations encompass "patient education and

-23-

counseling for all women with reproductive capacity." Women's Preventive Services: Required Health Plan Coverage Guidelines, HEALTH RESOURCES AND SERVICES ADMINISTRATION, http://www.hrsa.gov/womensguidelines/ (last visited Sep. 18, 2012). However, this speech is merely incidental to the conduct of receiving health care. See, Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 62 (2006) (finding compelled speech incidental to the conduct regulated by the Solomon Amendment; reasoning that "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct.")

Also, unlike the unconstitutional speech subsidies in United Foods, Abood, and Keller, the regulations here do not require funding of one defined viewpoint. "First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies *for speech on the side it favors*..." United Foods, 533 U.S. at 411 (italics added). In this case, the speech subsidized is an unscripted conversation between a doctor and a patient, not political propaganda in favor of one candidate, an amicus brief espousing one side of an issue, or advertisements in favor of a particular product. As the defendants correctly point out, adoption of plaintiffs' theory would mean that an employer's disagreement with the subject of a discussion between an employee and her physician would be a basis for precluding all government efforts to regulate health coverage.

Finally, the Court rejects the argument that "to the extent Plaintiffs are being compelled to fund conduct, that conduct is inherently expressive" Pls.' Mot. at 36 [Doc. #31]. Conduct is inherently expressive when "[a]n intent to convey a particularized

-24-

message was present, and... the likelihood was great that the message would be understood by those who viewed it." Texas v. Johnson, 491 U.S. 397, 404 (1989) (quoting Spence v. State of Washington, 418 U.S. 405, 410-11 (1974)). Neither the doctor's conduct in prescribing nor the patient's conduct in receiving contraceptives is inherently expressive. Giving or receiving health care is not a statement in the same sense as wearing a black armband (see Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503 (1969)) or burning an American flag (see Texas v. Johnson).

Here, the government has not compelled plaintiffs to speak, to subsidize speech, or to subsidize expressive conduct. Because plaintiffs have failed to state a claim under the Free Speech Clause of the First Amendment, Count IV of the Amended Complaint will be dismissed.

### E.   Administrative Procedure Act

Finally, plaintiffs claim that defendants violated the Administrative Procedure Act (APA), 5 U.S.C. 706(2)(A), by promulgating regulations contrary to existing law, and by arbitrary and capriciously failing to consider the impact of those regulations on secular, for-profit employers such as O'Brien and OIH. 5 U.S.C. 706(2)(A) (the "reviewing court shall hold unlawful and set aside agency action, findings, and conclusions founds to be arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law.") Plaintiffs argue that the preventive services coverage regulations conflict with RFRA, the First Amendment,[11] and a provision of the Affordable Care Act, stating that "nothing in this title... shall be construed to require a qualified health plan to provide coverage of [abortion] services... as part of its essential health

---

[11] Because the Court has found plaintiffs failed to state a claim under RFRA and the First Amendment, the Court will not address these arguments again.

benefits for any plan year." 42 U.S.C. §18023(b)(1)(A)(i). Defendants argue that plaintiffs lack prudential standing to bring suit under the APA, and therefore their claims should be dismissed for lack of jurisdiction. In the alternative, defendants maintain that plaintiffs have misconstrued the phrase "abortion services," and thus the regulations are in accordance with existing law, and are neither arbitrary nor capricious.

### 1. Prudential Standing and the Zone of Interests

The APA grants standing to persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. In addition to Article III standing, plaintiffs must also satisfy the requirements of prudential standing. As initially articulated by the Supreme Court, a plaintiff satisfies prudential standing if the plaintiff is "arguably within the zone of interests to be protected or regulated by the statute" that he says was violated. Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970).

Subsequent cases reveal that this standard is not particularly stringent. Instead, "we have always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." Match-E-Be-Nash-She-Wish Band of Pottowatomi Indians v. Patchak, 132 S.Ct. 2199, 2210 (2012). In Clarke v. Securities Industry Ass'n, 479 U.S. 388 (1987), the Supreme Court emphasized the expansive nature of the "zone of interests" when challenging administrative action. "In cases where the plaintiff is not itself the subject of the contested regulatory action the [zone of interest] test denies a right of review if the plaintiff's interests are so marginally related or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not

-26-

meant to be especially demanding; in particular there need be no indication of congressional purpose to benefit the would-be plaintiff." Id. at 399-400. See also DeLoss v. Dep't of Housing and Urban Dev., 822 F.2d 1460, 1463 (8th Cir. 1987) ("The test is satisfied if a plaintiff's asserted interest has a 'plausible relationship' to a general policy implicit in a relevant statute.")

As explained above, plaintiffs wish to proceed on the merits of two separate APA claims: first, that the regulations violate a separate provision of the ACA, and second, that the regulations are arbitrary and capricious. In this case, plaintiffs have prudential standing under the APA to challenge the HHS regulations as arbitrary and capricious. Plaintiffs' selection of health care plans for their employees will be altered by the ACA, and the ACA imposes penalties on non-complying employers. However, plaintiffs lack prudential standing to claim that the regulations conflict with an existing provision of the ACA, 42 U.S.C. §18023(b)(1)(A)(i) (as quoted above). Plaintiffs are not within the zone of interests protected under that provision, since it applies only to qualified health care plans available through Exchanges.[12]  42 U.S.C. §18021(a)(1)(A) (defining the term "qualified health plan"). Exchanges will not begin until 2014, 42 U.S.C. §18031(b), and even then qualified health plans will only be available to individuals and small employers (potentially excluding OIH) until 2017. 42 U.S.C. §18032(f)(2).

**2. Arbitrary and Capricious**

---

[12]  Exchanges are forums through which individuals and small businesses will be able to compare and purchase qualified health insurance plans. Affordable Insurance Exchanges, http://www.healthcare.gov/law/features/choices/exchanges/index.html (last visited September 28, 2012). Exchanges will operate via toll-free telephone hotlines and internet websites, providing standardized information about qualified plans, and tools to help consumers calculate the costs and benefits of each plan. See 42 U.S.C. §18031(d)(4) (describing the functions of Exchanges).

Plaintiffs allege that the defendants arbitrarily and capriciously ignored the impact of the regulations upon secular, for-profit employers maintaining religious values.  Review under the "arbitrary and capricious" standard is akin to rationality review:

> an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  See also Cent. S.D. Co-op, Grazing Dist. v. Sec'y of Dep't of Agric., 266 F.3d 889, 898 (8th Cir. 2001) ("When an agency has considered relevant evidence and arrived at a rational result, a party's mere dissatisfaction with the agency's decision does not entitle it to relief.")

Contrary to plaintiffs' assertions, defendants considered all religious objections to the regulations and arrived at a solution "intended to reasonably balance the extension of any coverage of contraceptive services… to as many women as possible, while respecting the unique relationship between certain religious employers and their employees in certain religious positions."  76 Fed. Reg. 46621, 46623 (August 3, 2011).  The temporary enforcement safe-harbor demonstrates that defendants considered and accommodated religious objections from organizations falling outside the definition of "religious employer."  Finally, as explained in the departments' advanced notice of proposed rulemaking (ANPRM), during the temporary safe-harbor "the Departments seek comment on which religious organizations should be eligible for the accommodation and whether, as some religious stakeholders have suggested, for-

profit religious employers with such objects should be considered as well." 77 Fed. Reg. 16501, 16504 (March 21, 2012).

The challenged regulations are neither arbitrary nor capricious, and therefore Count V of plaintiffs' Amended Complaint will be dismissed.

* * * * * *

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the defendants' motion to dismiss all counts of plaintiffs' Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is **granted**.

An Order of Dismissal will be filed separately.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 28th day of September, 2012.